UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
BANCO SAFRA S.A. – CAYMAN ISLANDS BRANCH :
et al.,                                                                  :
                                                                         :          16-CV-9997 (JMF)
                                          Plaintiffs,                    :
                                                                         :          OPINION AND ORDER
                -v-                                                      :
                                                                         :
ANDRADE GUTIERREZ INTERNATIONAL S.A., et                                 :
al.,                                                                     :
                                                                         :
                                          Defendants.                    :
                                                                         :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/08/2018

JESSE M. FURMAN, United States District Judge:

     In this action, two financial institutions bring securities fraud claims against a group of Brazilian entities and individuals, including Andrade Gutierrez International ("AG International") and Andrade Gutierrez Engenharia ("Engenharia"). The claims relate to more than $100 million in notes offered by AG International that Plaintiffs purchased in 2013 and 2014 (the "Notes"). (*See* Docket No. 41 ("SAC"), at ¶¶ 5, 22-23). Plaintiffs allege that the value of the Notes — which are due on April 30, 2018 — dropped precipitously when an investigation into corruption involving Defendants became public. (*See* SAC ¶¶ 5, 12, 32-44, 88, 91, 94, 96, 99, 101, 103, 108, 112). Plaintiffs' Second Amended Complaint (the "Complaint") alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. § 78a *et seq.*, and Rule 10b-5 promulgated thereunder, as well as related claims under New York state law. (*See* SAC ¶¶ 113-51). Defendants AG International and Engenharia, the only two Defendants who have been served to date, now move to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act

("PSLRA"), 15 U.S.C. § 78u-4, *et seq*. (Docket No. 42). For the reasons stated below, their motion is granted and the Complaint is dismissed.

## BACKGROUND

The following relevant facts, which are taken from the Complaint, documents it incorporates, and matters of which the Court may take judicial notice, are construed in the light most favorable to Plaintiffs. *See, e.g.*, *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *Gonzalez v. Hasty*, 651 F.3d 318, 321 (2d Cir. 2011).

In 2013, pursuant to an Offering Memorandum (SAC, Ex. A ("Offering Memorandum")), AG International, a wholly owned subsidiary of Defendant Andrade Gutierrez, "sold $500 million of 4.000% notes, due April 30, 2018." (SAC ¶¶ 4-5). The Notes were guaranteed by Engenharia, another wholly owned subsidiary of Andrade and "one of the largest companies in the engineering and heavy construction sector in Latin America." (*Id.* ¶¶ 3, 5). Plaintiff Banco Safra S.A. – Cayman Islands Branch ("Banco Safra") purchased $106,318,000 of the Notes in twenty-two transactions between April 2013 and October 2014, paying approximately 98% of par value. (*Id.* ¶ 22). Between April 2013 and June 2013, Plaintiff Safra National Bank of New York ("Safra National Bank") purchased $9,300,000 of the Notes for approximately 99% of par value. (*Id.* ¶ 23).

After Plaintiffs purchased the Notes, a bevy of criminal allegations against Andrade and its executives came to light. First, on December 30, 2014, Petrobras, Brazil's majority-state-owned gas corporation, announced that it was suspending Andrade and its subsidiaries from bidding on Petrobras contracts. (*Id.* ¶¶ 10, 87). On January 20, 2015, Andrade responded to reports that it was under investigation for corruption by issuing a statement denying that it ever participated in any "favoritism scheme involving political parties and Petrobras." (*Id.* ¶ 89). A

few months later, the Brazilian government announced that it was opening an investigation into Andrade. (*Id.* ¶ 95). And on June 19, 2015, Defendant Otavio Azevedo, Andrade's Chief Executive Officer, was arrested; just over one month later, on July 24, 2015, he and the company were indicted for participating in a price-fixing cartel. (*Id.* ¶¶ 32, 98). The indictment included allegations that Engenharia had benefited from a bid-rigging scheme to win bids from Petrobras and Eletrobras, another majority-state-owned corporation. (*Id.* ¶¶ 14, 32). Brazil's Federal Police also charged Azevedo with laundering money through Engenharia. (*Id.* ¶¶ 41, 105).

Andrade and Azevedo suffered significant consequences as a result of the indictment. Andrade paid a fine of approximately $300 million. (*Id.* ¶ 42). Azevedo was convicted and sentenced to eighteen years in prison. (*Id.* ¶ 14). According to Plaintiffs, the "market value of AG International's 2018 Notes" also declined dramatically. (*Id.* ¶ 112). Between December 30, 2014 and January 20, 2015, the approximate value of the Notes dropped from 87% of par value to 69% of par. (*Id.* ¶ 88). By July 30, 2015, after disclosure of the indictment, the value of the Notes had dropped to 62% of par value. (*Id.* ¶ 108). Plaintiffs seek to recover their losses, blaming them on a series of false and misleading statements made by Defendants, first in the Offering Memorandum itself and in later statements as news of the ongoing investigation and prosecution became public. (*See id.* ¶¶ 65-86, 100, 104).

## LEGAL STANDARDS

In reviewing a Rule 12(b)(6) motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 (S.D.N.Y. 2012). A court may not dismiss claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atlantic Corp. v.*

3

*Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

Because they allege securities fraud, Plaintiffs must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the PSLRA, which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). To satisfy Rule 9(b), a plaintiff "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

## DISCUSSION

Plaintiffs' primary federal claims are brought pursuant to Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5, 17 C.F.R.

4

§ 240.10b-5. (SAC ¶¶ 113-29). To state a claim under these provisions, a plaintiff must allege: "that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance." *Gurfein v. Ameritrade, Inc.*, 411 F. Supp. 2d 416, 425 (S.D.N.Y. 2006) (internal quotation marksomitted). Where, as here, the alleged deceptive act is a failure to disclose uncharged criminal conduct, the "critical consideration" is "whether the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. Jan. 6, 2016) (internal quotation marks omitted). As a general matter, courts in this Circuit have found a sufficient connection in three circumstances: "(1) when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices; (2) when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring; and (3) when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief." *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016) (internal quotation marks omitted).

Plaintiffs' federal claims are premised solely on alleged misstatements and omissions in the Offering Memorandum.[1] First and foremost, Plaintiffs allege that the "Offering Memorandum falsely described the bidding process, failing to disclose that Defendants were

---

[1] The Complaint also includes allegations with respect to certain statements Defendants made after publication of the Offering Memorandum. (*See, e.g.*, Compl. ¶ 100, 104). In their opposition to Defendants' motion, however, Plaintiffs confirm that their federal claims are not based on any of those statements. (Docket No. 47 ("Pls' Br."), at 11 n.10). That is for good reason, as the only statements alleged in the Complaint that predated Plaintiffs' purchase of the Notes are those in the Offering Memorandum, and the PSLRA "extends only to purchasers and sellers, not to holders, of securities." *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1063 (2014).

instrumental in forming and leading a cartel of similar contractor businesses that rigged bids for public projects in Brazil, through collusion with supposed competitors." (SAC ¶ 9). In a variation on that theme, Plaintiffs also allege that Defendants committed fraud by claiming falsely that financial statements included in the Offering Memorandum were "prepared in accordance with International Financial Reporting Standards." (SAC ¶ 81 (citing Offering Memorandum v)). In particular, the Complaint identifies two provisions of the "International Accounting Standards" with which the financial statements allegedly did not comply: "IAS1," which requires financial statements to faithfully represent "the effect of transactions, other events and conditions" in accordance with other provisions of the International Accounting Standards; and "IAS37," which calls for disclosure of, among other things, "contingent liabilities," defined as a "possible obligation that arises from past events and whose existence will be confirmed only by the occurrence or non-occurrence of one or more uncertain future events not wholly within the control of the entity." (SAC ¶¶ 46-47, 50-51).

These claims fail as a matter of a law for a straightforward reason: Defendants adequately disclosed the ongoing investigations into their bid-rigging scheme and, by extension, their "contingent liabilities." Specifically, the Offering Memorandum disclosed that,

> as part of our business and the industry in which we operate, claims may be brought against us to (i) temporarily suspend our participation in public biddings and impede us from entering into contracts with the Brazilian government; and (ii) declare us as unfit to bid for or to enter into contracts with the Brazilian government pending a determination of our culpability or until such time as any penalties enforced against us are rescinded. Moreover, *we are currently subject to claims alleging irregularities in certain bidding processes and public contracts for which we were awarded construction works*. In addition to monetary damages, certain of the plaintiffs in these proceedings also seek injunctions against our ability to contract with government or public sector companies. *In case decisions are issued against us, we could suffer a material adverse effect.*

(Offering Memorandum 23 (emphases added)). This cautionary language addressed the very risks that Plaintiffs claim were later realized: that an investigation into Defendants' business

6

might reveal that they "rigged bids for public projects in Brazil," (SAC ¶ 9), "causing the market value of the 2018 Notes to fall precipitously," (SAC ¶ 12). That is, "[t]he cautionary language addresse[d] the relevant risk[s] directly." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 360 (2d Cir. 2002). In light of that cautionary language, no reasonable investor could have relied on the statements in the Offering Memorandum that Plaintiffs now allege to be fraudulent. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("By disclosing its involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose [the defendant] to substantial monetary damages and legal defense costs, as well as injunctive relief, criminal and civil penalties, and the potential for regulatory restrictions, [the defendant] complied with its disclosure obligations under our case law." (internal quotation marks and brackets omitted)); *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 6 (2d Cir. 1996) (affirming dismissal of PSLRA claim where "the prospectuses even suggested the possibility of precisely the scenario that occurred").

In arguing otherwise, Plaintiffs contend that Defendants' disclosure was "deceptively broad." (Pls' Br. 16). "[W]here there is disclosure that is broad enough to cover a specific risk," however, "the disclosure is not misleading simply because it fails to discuss the specific risk." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014). Along similar lines, Plaintiffs contend that Defendants were required in the Offering Memorandum "to estimate potential fines and penalties to which Engenharia could be subjected." (Pls' Br. 16). But they cite no authority for the proposition that such a specific (and usually unknowable) disclosure is required. The bottom line is that Defendants disclosed the precise risks that came to pass — that because of "claims alleging irregularities in certain bidding processes," their participation in public bidding could be

"suspend[ed]" and they "could suffer a material adverse effect." (Offering Memorandum 23). Given those disclosures, "*no reasonable investor* could have been misled about the nature of the risk when he invested." *Halperin*, 295 F.3d at 359.

Plaintiffs' remaining arguments are premised on Defendants' statement in the Offering Memorandum that Andrade "aligns its corporate practices to standards issued by international entities, such as the International Finance Corporation" and other lenders. (Offering Memorandum 64; *see* SAC ¶¶ 45-64). The cautionary language in the Offering Memorandum arguably defeats any claims based on that statement too. In addition, however, considered in "the context in which [it was] made," *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015), that one statement does not support the weight that Plaintiffs put on it. That is, although the Offering Memorandum lists organizations with whose policies Andrade purports to "align[]" — namely, financial organizations that provide funding for Andrade's projects — it does not cite the specific *policies* themselves. Moreover, the Complaint does not even allege that many of the organizations themselves have established relevant standards — only that the organization "supports" a standard set forth by a separate organization, which is not mentioned in the Offering Memorandum. (*See* SAC ¶¶ 56, 57). In short, Defendants' statement that Andrade "aligns its corporate practices to standards issued by international entities," (Offering Memorandum 64), is both "too general" and too "aspirational" to support a securities-fraud claim, *City of Pontiac*, 752 F.3d at 183 (affirming dismissal of PSLRA claim where the statements identified by plaintiffs were "too general . . . [and] explicitly aspirational").

For the foregoing reasons, Plaintiffs' claims under Section 10(b) and Rule 10b-5 fail as a matter of law.[2] It follows that Plaintiffs' claims for control person liability under Section 20(a) of the Securities Exchange Act, which depend upon the existence of a "primary violation," also fail. *See, e.g.*, *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 606 (S.D.N.Y. 2016). Additionally, because the flaws in Plaintiffs' claims are inherent to the statements in the Offering Memorandum themselves — and not specific to any particular Defendant — there is no basis to allow Plaintiffs' claims to proceed against Andrade Gutierrez S.A., Otavio Azevedo, and Leandro De Aguiar — even though those Defendants are not party to the present motion (because they have not yet been served or appeared). Thus, Plaintiffs' federal claims are dismissed against all Defendants. Moreover, that dismissal is without leave to amend, for three reasons. First, given the grounds for the Court's decision, amendment would likely be futile. *See, e.g.*, *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend."); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 352 (S.D.N.Y. 2015) (denying request for leave to amend where "[t]he alleged misstatements about [Defendants'] business practices . . . are too general to be actionable"). Second, and related, Plaintiffs neither request leave to amend (for a third time) nor give "any indication that [they are] in possession of facts that would cure the problems identified in this opinion." *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014); *see also Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 821 F.3d 349, 352 (2d Cir. 2016) (holding that it was not an abuse of discretion to deny the plaintiffs an opportunity to amend their complaint where

---

[2] In light of that conclusion, the Court need not and does not address Defendants' other arguments for dismissal.

plaintiffs "did not ask the district court for leave to amend"); *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint."). And finally, in granting leave to file a second amended complaint (*see* Docket No. 40), the Court expressly warned that Plaintiffs would not be given another opportunity to address the issues raised in Defendants' motion to dismiss. *See, e.g.*, *Clark*, 2014 WL 4054284, at *15 (holding that the plaintiff's failure to remedy the complaint's deficiencies identified by an earlier motion to dismiss "is alone sufficient grounds to deny leave to amend"); *see also, e.g.*, *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (affirming the district court's denial of leave to amend in part because of previous opportunities that the plaintiff had received to amend the complaint).

**B. State-Law Claims**

That leaves Plaintiffs' state-law claims. In light of the Court's dismissal of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over those claims. Pursuant to Title 28, United States Code, Section 1367, a district court has discretion over whether to exercise jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Supreme Court and the Second Circuit have made clear, however, that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir.1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Here, there is no basis to depart from that general rule. Given the relatively early state of the case, the traditional "values of judicial economy, convenience, fairness, and comity" that the Court must consider do not counsel in favor of exercising jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484

U.S. 343, 350 (1988). Accordingly, Plaintiffs' state-law claims are dismissed. *See* 28 U.S.C. § 1367(c); *see also, e.g., Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) (recognizing that if the plaintiff's federal claims are dismissed before trial and there has not been a substantial expenditure of resources on the state claims, state claims should generally be dismissed as well).

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted and Plaintiffs' Complaint is dismissed. The Clerk of Court is directed to terminate Docket No. 42, to enter judgment in favor of Defendants, and to close this case.

SO ORDERED.

Date: March 8, 2018
New York, New York

_____
JESSE M. FURMAN
United States District Judge